**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> HUI HSIUNG, AKA Kuma, *Defendant-Appellant*. | No. 12-10492 <br><br> D.C. No. 3:09-cr-00110-SI-8 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br> v. <br><br> HSUAN BIN CHEN, AKA H.B. Chen, *Defendant-Appellant*. | No. 12-10493 <br><br> D.C. No. 3:09-cr-00110-SI-9 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> AU OPTRONICS CORPORATION, *Defendant-Appellant*. | No. 12-10500 <br><br> D.C. No. 3:09-cr-00110-SI-10 |

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. AU OPTRONICS CORPORATION AMERICA, INC., *Defendant-Appellant*. | No. 12-10514 D.C. No. 3:09-cr-00110-SI-11 ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Northern District of California
Susan Illston, Senior District Judge, Presiding

Argued and Submitted
October 18, 2013—San Francisco, California

Filed July 10, 2014
Amended January 30, 2015

Before: Sidney R. Thomas, Chief Judge, M. Margaret
McKeown, Circuit Judge, and Virginia M. Kendall, District
Judge.[*]

Order;
Opinion by Judge McKeown

---

[*] The Honorable Virginia M. Kendall, District Judge for the U.S. District Court for the Northern District of Illinois, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel filed an amended opinion affirming the convictions of all defendants and the sentence of the only defendant to challenge the sentence, denied a petition for panel rehearing, and denied a petition for rehearing en banc on behalf of the court, in a criminal antitrust case that stems from an international conspiracy between Taiwanese and Korean electronics manufacturers to fix prices for Liquid Crystal Display panels known as TFT-LCDs in violation of the Sherman Act.

The panel held that venue in the Northern District of California was proper.

The panel held that the defendants waived the argument that an extraterritoriality defense bars their convictions, and held that, viewing the jury instructions as a whole, nothing misled the jury as to its task.

The panel held that the district court properly applied a *per se* analysis under the Sherman Act, rather than the rule of reason, to this horizontal price-fixing scheme.

The panel held that the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a (FTAIA), is not a subject-matter jurisdiction limitation on the power of the federal courts but a component of the merits of a Sherman

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Act claim involving nonimport trade or commerce with foreign nations.

The panel held that the indictment contained the factual allegations necessary to establish that the FTAIA either did not apply or that its requirements were satisfied. The panel explained that import trade does not fall within the FTAIA at all; it falls within the Sherman Act without further clarification or pleading. The panel therefore disagreed with the defendants' view that the indictment was insufficient because it did not allege import trade under the FTAIA. The panel held that the government sufficiently pleaded and proved that the conspirators engaged in import commerce with the United States and that the price-fixing conspiracy violated § 1 of the Sherman Act.

The panel explained that if the government proceeds on a domestic effects theory, which it did here, the government must plead and prove the requirements for the domestic effects exception to the FTAIA, namely that the defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on United States commerce. The panel held that the indictment sufficiently alleged such conduct. The panel disagreed with the government that the FTAIA is an affirmative defense to a Sherman Act offense, and held that the domestic effects instruction did not result in a constructive amendment of the indictment. The panel rejected the defendants' sufficiency of evidence challenge to the domestic effects exception. The panel noted that even disregarding the domestic effects exception, the evidence offered in support of the import trade theory alone was sufficient to convict the defendants of price-fixing in violation of the Sherman Act.

The panel affirmed a $500 fine imposed on AU Optronics pursuant to the Alternative Fine Statute, 18 U.S.C. § 3571(d). The panel held that § 3571(d) permits the fine to be based on the gross gains to all the coconspirators rather than on the gains to AU Optronics alone. The panel wrote that no statutory authority or precedent supports AU Optronics' interpretation of the statute as requiring joint and several liability or imposition of a "one recovery" rule.

## COUNSEL

Kristen C. Limarzi (argued), Peter K. Huston, Heather S. Tewksbury, E. Kate Patchen, Jon B. Jacobs, John J. Powers III, James J. Fredericks, and Adam D. Chandler, Attorneys, United States Department of Justice, Antitrust Division, Washington, D.C., for Plaintiff-Appellee United States of America.

Neal Kumar Katyal (argued), Christopher T. Handman, and Elizabeth Barchas Prelogar, Hogan Lovells US LLP, Washington, D.C., for Defendant-Appellant Hui Hsiung; Michael A. Attanasio (argued) and Jon F. Cieslak, Cooley LLP, San Diego, California, for Defendant-Appellant, Hsuan Bin Chen; Dennis P. Riordan (argued) and Donald M. Horgan, Riordan & Horgan, San Francisco, California, and Ted Sampsell-Jones, William Mitchell College of Law, St. Paul, Minnesota, for Defendants-Appellants AU Optronics Corporation and AU Optronics Corporation America; and John D. Cline, Law Office of John D. Cline, San Francisco, California, for Defendant-Appellant AU Optronics Corporation America.

Dr. Chang C. Chen, Law Offices of Chang C. Chen, San Francisco, California; John Shaeffer and Carole E. Handler, Lathrop & Gage LLP, Los Angeles, California; Sang N. Dang and Andrew B. Chen, Blue Capital Law Firm, PC, Costa Mesa, California, for Amicus Curiae Professor Andrew Guzman.

## ORDER

The opinion filed on July 10, 2014, is amended. The amended opinion is filed concurrently with this order.

The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter.

The petition for panel rehearing and the petition for rehearing en banc are **DENIED**. No further petitions for panel rehearing or petitions for rehearing en banc will be entertained.

**OPINION**

McKEOWN, Circuit Judge:

This criminal antitrust case stems from an international conspiracy between Taiwanese and Korean electronics manufacturers to fix prices for what is now ubiquitous technology, Liquid Crystal Display panels known as "TFT-LCDs."[1] After five years of secret meetings in Taiwan, sales worldwide including in the United States, and millions of dollars in profits to the participating companies, the conspiracy ended when the FBI raided the offices of AU Optronics Corporation of America ("AUOA") in Houston, Texas.

The defendants, AU Optronics ("AUO"), a Taiwanese company, and AUOA, AUO's retailer and wholly owned subsidiary (collectively, "the corporate defendants"), and two executives from AUO, Hsuan Bin Chen, its President and Chief Operating Officer, and Hui Hsiung, its Executive Vice President, were convicted of conspiracy to fix prices in violation of the Sherman Act after an eight-week jury trial.[2] Their appeal raises complicated issues of first impression

---

[1] TFT-LCD, which is an abbreviation for Thin-Film-Transistor Liquid-Crystal Display, is a display technology used in flat panel computer monitors, notebook computers, flat panel televisions, and other devices. A "TFT display" is "[a] display using a refinement of LCD technology in which each liquid-crystal cell, or pixel, is controlled by three separate transistors, one each for red, blue, and green." Stephen Kleinedler (ed.), *Dictionary of Computer and Internet Words: An A to Z Guide to Hardware, Software, and Cyberspace* 270 (2001).

[2] Seven other individuals who are not parties to this appeal were named as coconspirators in the operative indictment.

regarding the reach of the Sherman Act in a globalized economy. More specifically, they contend that the rule of reason applies to this price-fixing conspiracy because of its foreign character. This proposition, pegged to foreign involvement, does not override the long standing rule that a horizontal price-fixing conspiracy is subject to *per se* analysis under the antitrust laws. The defendants also urge that because the bulk of the panels were sold to third parties worldwide rather than for direct import into the United States, the nexus to United States commerce was insufficient under the Sherman Act as amended by the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA"). The defendants' efforts to place their conduct beyond the reach of United States law and to escape culpability under the rubric of extraterritoriality are unavailing. To begin, the defendants waived their challenge that *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), displaced the Supreme Court's landmark case regarding antitrust and extraterritoriality, *Hartford Fire Insurance v. California*, 509 U.S. 764 (1993). In light of the substantial volume of goods sold to customers in the United States, the verdict may be sustained as import commerce falling within the Sherman Act. The verdict may also be sustained under the FTAIA's domestic effects provision because the conduct had a "direct, substantial, and reasonably foreseeable effect on United States commerce." 15 U.S.C. § 6a. We affirm the convictions of all defendants and the sentence of AUO, the only defendant to challenge the sentence.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I. THE CONSPIRACY

From October 2001 to January 2006, representatives from six leading TFT-LCD manufacturers met in Taiwan to "set[] the target price" and "stabilize the price" of TFT-LCDs, which were sold in the United States principally to Dell, Hewlett Packard ("HP"), Compaq, Apple, and Motorola for use in consumer electronics. This series of meetings, in which Chen, Hsiung, and other AUO employees participated, came to be known as the "Crystal Meetings."

Following each Crystal Meeting, the participating companies produced "Crystal Meeting Reports." These reports provided pricing targets for TFT-LCD sales, which, in turn, were used by retail branches of the companies as price benchmarks for selling panels to wholesale customers. More specifically, AUOA used the Crystal Meeting Reports that AUO provided to negotiate prices for the sale of TFT-LCDs to United States customers including HP, Compaq, ViewSonic, Dell, and Apple. AUOA employees and executives routinely traveled to the United States offices of Dell, Apple, and HP in Texas and California to discuss pricing for TFT-LCDs based on the targets coming out of the Crystal Meetings. Chen and Hsiung played the most "critical role[s]" in settling price disputes with executives at Dell.

Crystal Meeting participants stood to make enormous profits from TFT-LCD sales to United States technology retailers. During the conspiracy period, the United States comprised approximately one-third of the global market for personal computers incorporating TFT-LCDs, and sales of panels by Crystal Meeting participants to the United States

generated over $600 million in revenue. Sales to key United States companies, Dell, Compaq, and HP, were particularly important because they were bellwether companies—if they accepted a price increase, "the entire market could also accept the price increase."

## II. PROCEEDINGS IN THE DISTRICT COURT

The defendants were indicted in the Northern District of California and charged with one count of conspiracy to fix prices for TFT-LCDs in violation of the Sherman Act, 15 U.S.C. § 1 *et seq*. The indictment also contained a sentencing allegation pursuant to the Alternative Fine Statute, 18 U.S.C. § 3571(d), alleging that AUO and AUOA, along with their coconspirators, "derived gross gains of at least $500,000,000."

The defendants twice moved to dismiss the indictment. The district court denied the first motion and rejected the arguments that (i) the rule of reason should apply pursuant to *Metro Industries v. Sammi Corp.*, 82 F.3d 839 (9th Cir. 1996), and (ii) the government was required to plead and prove that the defendants acted with knowledge that their conduct would have anticompetitive effects on United States commerce. The district court held that the rule of reason did not apply because horizontal price-fixing historically has been considered a *per se* violation of the Sherman Act, *Metro Industries* notwithstanding.

The district court also denied the second motion to dismiss the indictment and rejected the argument that the indictment was deficient for failing to allege an "intended and substantial effect" on United States commerce as required by the FTAIA. According to the district court, "[b]y its express

terms, the [FTAIA] is inapplicable to [the] import activity conducted by defendants." The district court also concluded that the FTAIA did not bar prosecution of this price-fixing conspiracy involving both foreign and domestic conduct.

At trial, the government presented evidence regarding the defendants' extensive involvement in the Crystal Meetings and their sales of price-fixed TFT-LCDs to customers in the United States, including evidence that the defendants specifically targeted United States technology companies, principally, Apple, Compaq, and HP. Government experts testified regarding the financial impact of those sales, specifically that the defendants derived hundreds of millions of dollars in profits from sales of price-fixed TFT-LCDs in the United States.

In closing arguments, defense counsel argued, among other things, that the government had not met its burden of proving venue by a preponderance of the evidence. On rebuttal, the government responded and directly addressed venue for the first time, explaining that venue was appropriate in the Northern District of California because "[t]he conspirators' negotiation of price-fixed panels with HP in Cupertino were acts in furtherance of this conspiracy." Defense counsel objected on the ground that the government's representation misstated the evidence. The district court overruled the objection, relying on the government's representation that this fact was in evidence.

During the jury instruction conference, as well as in pretrial proceedings, the reach of the Sherman Act to conduct occurring outside of the United States was a contentious subject. In describing the application of the Sherman Act, the district judge settled on the following charge:

The Sherman Act [] applies to conspiracies that occur entirely outside the United States if they have a substantial and intended effect in the United States. Thus, to convict the defendants you must find beyond a reasonable doubt one or both of the following:

(A)     that at least one member of the conspiracy took at least one action in furtherance of the conspiracy within the United States, or

(B)     that the conspiracy had a substantial and intended effect in the United States.

The jury found the defendants guilty of conspiracy to fix prices in violation of the Sherman Act. The jury also found that the "combined gross gains derived from the conspiracy by all the participants in the conspiracy" were "$500 million or more."

The defendants moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, and, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33. They argued that (i) the government had failed to establish venue in the Northern District of California, (ii) the rule of reason should have applied pursuant to *Metro Industries*, (iii) the defendants did not have notice of the unlawfulness of their conduct, (iv) the government had failed to prove an exception to the FTAIA, and (v) the evidence was insufficient as a matter of law to establish the $500 million or more loss amount. AUOA also claimed that the government did not prove that any agent of AUOA knowingly and

intentionally participated in the price-fixing agreement. The district court denied the motions.

The district court sentenced Hsiung and Chen principally to a term of thirty-six months' imprisonment and a $200,000 fine each. The district court sentenced the corporate defendants principally to a three-year term of probation with conditions. The district court also imposed a $500 million fine on AUO. All of the defendants appeal their convictions, and AUO appeals its sentence.

## ANALYSIS

### I. VENUE CHALLENGE

As a preliminary matter, the defendants appeal on the basis of improper venue.[3] Four issues are subsumed in the venue challenge: (i) our standard of review, (ii) the proper standard for proof at trial, (iii) whether the government's representation in closing arguments constituted prosecutorial misconduct, and (iv) whether the government proved venue.

Although the defendants suggest otherwise, we review de novo whether venue was proper. *United States v. Liang*, 224 F.3d 1057, 1059 (9th Cir. 2000). The defendants argue that the standard of review should be whether "a rational jury could not fail to conclude that . . . the evidence establishes venue," because the district court "in substance" decided the issue of venue as a matter of law when it overruled the objection to the government's representation in rebuttal that

---

[3] Hsiung and Chen raise the issue of improper venue; however, all of the defendants adopt by reference and join in all arguments raised by their co-defendants for purposes of this appeal. *See* Fed. R. App. P. 28(i).

negotiations of price-fixed TFT-LCDs occurred in the Northern District of California. *See United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012). That's a mouthful. Nonetheless, the district court's evidentiary ruling did not decide venue as a matter of law. *See id.* at 1112–13, 1120 (finding venue decided as a matter of law when the jury did not find venue proper, and the district court ruled that venue was proper on a Rule 29 motion). The proper standard of review remains de novo.

It is well established that a preponderance of the evidence is the proper standard of proof for venue. *See, e.g.*, *id.* at 1120. The defendants' position that the standard is beyond a reasonable doubt has no support in the law. The district court appropriately instructed the jury on the standard of proof for venue.

Next, we consider the government's timing in addressing venue. The issue of venue was affirmatively highlighted for the first time in the defendants' closing argument, and the government then responded in its rebuttal argument. The defendants argue that it was prosecutorial misconduct and reversible error for the prosecutor to represent in rebuttal that "[t]he conspirator's negotiation of price-fixed panels with HP in Cupertino were acts in furtherance of this conspiracy." Neither the timing of this statement nor its substance constitutes misconduct. The defendants accuse the government of sandbagging by relying on "late-breaking theories" of venue in rebuttal. However, the defense invited a response by raising the venue issue in the first place. A prosecutor may respond in rebuttal to an attack made in the defendant's closing argument. *See Lawn v. United States*, 355 U.S. 339, 359 n.15 (1958). The substance of the government's response was not new evidence or allegations;

instead, it was permissible argument based on the indictment's allegations and the evidence produced at trial. The indictment alleged that the charged conspiracy "was carried out, in part, in the Northern District of California." Trial testimony established that AUO employees negotiated prices for TFT-LCDs with HP in Cupertino, California. *See United States v. Reyes*, 660 F.3d 454, 462 (9th Cir. 2011) ("It is certainly within the bounds of fair advocacy for a prosecutor, like any lawyer, to ask the jury to draw inferences from the evidence that the prosecutor believes in good faith might be true." (quoting U*nited States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002))). The jury also was instructed that closing arguments were not evidence. Accordingly, the prosecutor did not commit misconduct by making these statements during closing argument, and the district court properly overruled the defendant's objection.

Finally, the evidence referenced by the government was sufficient to establish venue by a preponderance of the evidence. "It is by now well settled that venue on a conspiracy charge is proper where . . . any overt act committed in furtherance of the conspiracy occurred." *United States v. Gonzalez*, 683 F.3d 1221, 1224 (9th Cir. 2012). In addition to the HP negotiations, the government introduced evidence that AUOA representatives negotiated sales of price-fixed TFT-LCDs with Apple in the Northern District of California and that AUOA maintained offices in the Northern District of California from which it conducted price negotiations by e-mail and phone. This evidence is sufficient to establish by a preponderance of the evidence that overt acts in furtherance of the conspiracy occurred in the Northern District of California. Thus, venue was proper.

## II. JURY INSTRUCTION CHALLENGE AND EXTRATERRITORIALITY OF THE SHERMAN ACT

The Supreme Court's seminal case on antitrust and foreign conduct is *Hartford Fire*, in which the Court held that "the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." 509 U.S. at 796. The district court instructed the jury to this effect: "to convict the defendants you must find beyond a reasonable doubt one or both of the following [] (A) that at least one member of the conspiracy took at least one action in furtherance of the conspiracy within the United States, or (B) that the conspiracy had a substantial and intended effect in the United States."

Before trial, the defendants moved to dismiss the indictment on the basis that it did not allege adequately the *Hartford Fire* "substantial and intended effects" test. At the jury instructions conference, the defendants urged the district court to give the *Hartford Fire* instruction, while also claiming that part A of the instruction was erroneous because it permitted the jury to convict on the basis of one domestic act. Although the defendants contested part A, they all concurred that part B "is a correct statement of the *Hartford Fire* requirements for establishing extraterritorial jurisdiction over foreign anticompetitive conduct, and should be given."

In an about face, in post-trial motions, the defendants rejected the principle of *Hartford Fire* and argued for the first time that the Sherman Act cannot be used to prosecute foreign conduct because there is no affirmative indication that the Sherman Act applies extraterritorially. They cited to the Supreme Court's decision in *Morrison*, which addressed the extraterritorial reach of the federal securities laws.

At the time of the jury instructions conference, in February 2012, *Morrison* had been on the books for more than eighteen months. Commentary about the case was extensive. *See, e.g.*, Nathan Koppel & Ashby Jones, *Securities Ruling Limits Claims of Fraud*, Wall St. J., Sept. 28, 2010, at C1; Hogan Lovells, *US Supreme Court rejects extraterritorial reach of Securities Exchange Act antifraud provisions*, June 30, 2010. The opinion was hardly breaking news. In light of the defendants' request that the court give the *Hartford Fire* jury instruction and their untimely objection to the instruction in post-trial motions, we hold that the defendants waived the argument that *Morrison* overruled *Hartford Fire* and that an extraterritoriality defense bars their convictions.

Because the defendants were the ones who proposed the instruction in the first place, they cannot now claim that giving the instruction was error. The defendants considered the effects of the instruction and intentionally relinquished the right to argue that the Sherman Act does not apply extraterritorially. *See United States v. Baldwin*, 987 F.2d 1432, 1437 (9th Cir. 1993) ("Where the defendant himself proposes the jury instruction he later challenges on appeal, we deny review under the invited error doctrine."). To be sure, the defendants point out that they raised the extraterritoriality argument in post-trial motions. However, the complete reversal of their position after the verdict and in post-trial motions "was so untimely as to amount to a waiver," with respect to the *Morrison* objection to the jury instruction. *See United States v. Stapleton*, 600 F.2d 780, 782 (9th Cir. 1979) (internal quotation marks omitted). This case falls squarely within the "invited error" doctrine, which covers "known rights that have been intentionally relinquished or

abandoned."**4**  *United States v. Perez*, 116 F.3d 840, 842 (9th Cir. 1997) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)) (internal quotation marks and alterations omitted).  This is not a case of forfeiture, where defense counsel simply failed "to make a timely assertion of a [claimed] right."  *Id.* at 845.  Waiver occurred here because, despite having knowledge of the law, the defendants "proposed or accepted" what they now claim to be "a flawed instruction."  *See id.*  That this election was knowing is underscored by the defendants' challenge to part A of the instruction versus their support for part B, the *Hartford Fire* formulation.

As to part A of the instruction, the defendants objected on the basis that it "would render *Hartford Fire* entirely nugatory, as, having proven the most minimal act in furtherance of a charged agreement, the government would never have to prove an intended and substantial effect on US commerce."  In support of this argument, the defendants rely

---

**4** We note that we would reach the same conclusion if the defendants' conduct were characterized as forfeiture subject to plain error review.  *See United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Perez*, 116 F.3d 840, 846–48 (9th Cir. 1997) (en banc).  "The Supreme Court mandated a four-part inquiry to determine whether an error may be corrected under Rule 52(b): (1) there must be error; (2) it must be plain; and (3) it must affect substantial rights.  Even after a reviewing court finds plain error under this three-part rubric, relief remains discretionary under *Olano*'s fourth and final requirement.  The Court of Appeals should correct a plain forfeited error affecting substantial rights if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."  *Perez*, 116 F.3d at 846 (internal quotation marks omitted).  No plain error resulted from the jury instruction because neither the Supreme Court nor this court has determined that *Morrison* overruled *Hartford Fire*.  *See Johnson v. United States*, 520 U.S. 461, 467–68 (1997).

on the following statement in *Hartford Fire*: "[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States," 509 U.S. at 796, and *United States v. Aluminum Co. of America*, 148 F.2d 416, 444 (2d Cir. 1945) (L. Hand, J.). As to part B, the defendants agreed that the instruction was accurate.

We have held that the FTAIA's requirement that the defendants' conduct had a "direct, substantial, and reasonably foreseeable effect" on domestic commerce displaced the intentionality requirement of *Hartford Fire* where the FTAIA applies. *See United States v. LSL Biotechnologies*, 379 F.3d 672, 678–79 (9th Cir. 2004). To the extent that the prosecution was not subject to the FTAIA, the jury instructions as a whole belie the assertion that the jury could have convicted on the basis of one, unintentional domestic act. *See United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."). Immediately following the *Hartford Fire* instruction, the district court instructed the jury that it must find the following beyond a reasonable doubt:

> [T]hat the members of the conspiracy engaged in one or both of the following activities:
>
> (A) fixing the price of TFT-LCD panels targeted by the participants to be sold in the United States or for delivery to the United States; or

(B) fixing the price of TFT-LCD panels that were incorporated into finished products such as notebook computers, desktop computer monitors, and televisions, and that this conduct had a direct, substantial, and reasonably foreseeable effect on trade or commerce in those finished products sold in the United States or for delivery to the United States. In determining whether the conspiracy had such an effect, you may consider the total amount of trade or commerce in those finished products sold in the United States or for delivery to the United States; however, the government's proof need not quantify or value that effect.

The effect of foreign conduct in the United States was a central point of controversy throughout the trial. Nonetheless, the conduct always was linked, as in the above instruction, to targeting for sale or delivery in the United States. Part A of the instruction required the jury to find that the defendants fixed the prices of TFT-LCDs "targeted" for sale or delivery in the United States. This "targeting" language subsumed intentionality. *See Oxford English Dictionary* 642 (2d ed. 1989) (defining "targeted" as "[d]esignated or chosen as a target"). There is no way that the defendants could have unintentionally designated or chosen the United States market as a target of the conspiracy. Viewing the instructions as a whole, nothing misled the jury as to its task. The *Hartford Fire* jury instruction was neither a surprise nor was it improper. Part A of the instruction passes legal muster, and the defendants solicited part B.

## III. *PER SE* LIABILITY FOR HORIZONTAL PRICE-FIXING

Having determined that the prosecution was not barred by an extraterritoriality defense, we address the appropriate standard for judging liability in this price-fixing scheme. For over a century, courts have treated horizontal price-fixing as a *per se* violation of the Sherman Act. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940) ("[F]or over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act and that no showing of so-called competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense."). Twice in recent years, the Supreme Court reiterated this principle. The directive in *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007), is unequivocal: "A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful." And just last year, the Chief Justice emphasized that "it is *per se* unlawful to fix prices under antitrust law." *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2239 (2013) (Roberts, C.J., dissenting on other grounds).

Consistent with Supreme Court precedent, the district court treated this price-fixing case as governed by the *per se* rule. The defendants claim that the district court erred by not adopting the rule of reason as the benchmark and that the indictment, jury instructions, and proof were deficient under rule of reason analysis. We hold that the price-fixing scheme as alleged and proven is subject to *per se* analysis under the Sherman Act.

According to the defendants, this is not a *per se* case because under *Metro Industries*, "application of the *per se* rule is not appropriate where the conduct in question occurred in another country." 82 F.3d at 844–45. This approach invites us to ignore the significant differences between *Metro Industries* and this case. We decline to do so.

To begin, *Metro Industries* was not a price-fixing case; rather, it involved an unusual horizontal market division for stainless steamers by a group of Korean companies. 82 F.3d at 843–44. The Korean Holloware Association (the "Association") established a design committee consisting of Korean manufacturers, traders, patent attorneys, and government officials. *Id.* at 841. The Association prohibited trading companies from holding a patent to a design, unless it was held jointly with a manufacturing company. *Id*. When Metro Industries, a manufacturer, experienced a disruption in stainless steamer supply from its trading counterpart, Sammi Corporation, the Association blocked its attempts to partner with another trading company. *Id.* at 841–42. Based on that interference, Metro Industries brought suit against Sammi and its American subsidiaries alleging, among other claims, violations of §§ 1 and 2 of the Sherman Act. *Id.* at 842; *see* 15 U.S.C. §§ 1, 2. The district court granted summary judgment in the defendants' favor and denied Metro Industries's cross-motion for summary judgment on the claim "that the Korean design registration system under which Sammi had the exclusive rights to manufacture a particular steamer design constituted a market division that was illegal *per se* under § 1 of the Sherman Act." *Metro Industries*, 82 F.3d at 843.

Our court affirmed and held that because the market division at issue was "*not* a classic horizontal market division

agreement," the rule of reason applied. *Id.* at 844 (emphasis added). We then went on to write that even if the registration system constituted a market division that would ordinarily be treated as a *per se* violation of the Sherman Act, the rule of reason applied because the allegedly unlawful conduct occurred in a foreign country. *Id.* at 844–45.[5]

Unlike *Metro Industries*, this case centers on a classic horizontal price-fixing scheme. Also unlike *Metro Industries*, in which there was "no evidence of actual injury to competition in the United States," 82 F.3d at 848, the voluminous evidence here documents substantial effects in the United States. The conduct here did not occur in a solely foreign bubble. Although the agreement to fix prices occurred in Taiwan, the sale of price-fixed TFT-LCDs occurred in large part in the United States. So, too, did part of the conspiracy to carry out that price-fixing agreement. We are unwilling to extend *Metro Industries* to a case where both part of the conduct and the effects of that conduct occurred in the United States.

---

[5] Not surprisingly, this statement has been the subject of scholarly criticism. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 273b (3d ed. 2006) ("Perhaps the court's conclusion that restraints abroad *always* require rule of reason analysis would have been more qualified had the restraint before it belonged more clearly in the *per se* category without offsetting considerations of comity."); Stephen Calkins, *The Antitrust Year in Review: Antitrust Olympics 1995-96*, 11 Fall Antitrust 22, 22, 25 (1996) ("Surely a classic international cartel that substantially affects U.S. commerce ought to qualify for *per se* treatment. *Metro Industries* was a procedurally unusual case, in which the record from one unsuccessful proceeding was offered to support a second in which there was 'no evidence of actual injury to competition in the United States.' Courts in future cases should limit *Metro Industries*'s language to its facts." (quoting *Metro Indus.*, 82 F.3d at 848)).

In invoking the *per se* rule for horizontal price-fixing, we join the reasoning of other circuits. *See, e.g.*, *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 2–3, 7, 9 (1st Cir. 1997) (upholding an indictment alleging a *per se* violation of the Sherman Act against a Japanese fax paper manufacturer that entered into a price-fixing conspiracy overseas for fax paper that was sold to companies in the United States at fixed prices.). The district court appropriately rejected the rule of reason defense.[6]

## IV.     THE FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT

The international implications of this case are not limited to the challenges to the jury instructions or the *per se* rule. The defendants also argue that the indictment and proof did not satisfy the requirements of the FTAIA. The FTAIA provides that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—(1) such conduct has a direct, substantial, and reasonably foreseeable effect—(A) on trade or commerce which is not trade or commerce with foreign nations . . . ." 15 U.S.C. § 6a.

Although the statute is a web of words, it boils down to two principles. First, the Sherman Act applies to "import trade or import commerce" with foreign nations. *Id.* Put differently, the FTAIA does not alter the Sherman Act's coverage of import trade; import trade is excluded from the FTAIA altogether. Second, under the FTAIA, the Sherman

---

[6] In light of our holding and Supreme Court precedent, we cannot embrace the defendants' argument that adopting a *per se* standard violates the fair notice principle of the Due Process Clause.

Act does not apply to nonimport trade or commerce with foreign nations, unless the domestic effects exception is met. *Id.* For the Sherman Act to apply to nonimport trade or commerce with foreign nations, the conduct at issue must have a "direct, substantial, and reasonably foreseeable effect—(A) on trade or commerce which is not trade or commerce with foreign nations . . . ." *Id.*

Congress enacted the FTAIA in 1982 in "respon[se] to concerns regarding the scope of the broad jurisdictional language in the Sherman Act." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 985 (9th Cir. 2008). As the Supreme Court explained, "[t]he FTAIA seeks to make clear to American exporters (and to firms doing business abroad) that the Sherman Act does not prevent them from entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 161 (2004) (citing H.R. Rep. No. 97–686, at 1–3, 9–10 (1982), U.S. Code Cong. & Admin. News 1982, 2487, 2487–2488, 2494–2495). *Empagran* teaches that the FTAIA removes from the reach of the Sherman Act "(1) export activities and (2) other commercial activities taking place abroad, *unless* those activities adversely affect domestic commerce, imports to the United States, or exporting activities of one engaged in such activities within the United States." 542 U.S. at 161. We now consider the multiple legal issues the FTAIA challenge raises.

## A. JURISDICTION VERSUS MERITS

Whether the FTAIA "affects the subject-matter jurisdiction of the district court or if, on the other hand, it

relates to the scope of coverage of the antitrust laws," is our first inquiry. *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 851 (7th Cir. 2012) (en banc). We start here because "[a] court has a duty to assure itself of its own jurisdiction, regardless of whether jurisdiction is contested by the parties," *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010), and "the Supreme Court has emphasized the need to draw a careful line between true jurisdictional limitations and other types of rules," *Minn-Chem*, 683 F.3d at 851–52 (citing *Morrison*, 561 U.S. 247 and *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011)). We hold that the FTAIA is not a subject-matter jurisdiction limitation on the power of the federal courts but a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations.

We have not definitively addressed this issue in the past. In *LSL Biotechnologies*, 379 F.3d at 680, we rejected the argument that foreign conduct having only a "substantial" effect on United States commerce satisfied the FTAIA and held that the FTAIA "created [a] jurisdictional test" requiring "a direct, substantial, and reasonably foreseeable effect" on domestic commerce. *Id.* at 679 (internal quotation marks omitted). Despite our use of the term "jurisdictional," we did not analyze whether the FTAIA provided a jurisdictional limitation on the power of the federal courts nor did we discuss our use of the term "jurisdictional." Seven years later, in *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, we observed that "[i]t is unclear, however, whether the FTAIA is more appropriately viewed as withdrawing jurisdiction from the federal courts . . . or as simply establishing a limited cause of action" and "decline[d] to resolve the question." 546 F.3d at 985 n.3.

As a consequence of clarification by the Supreme Court, much has changed since *LSL Biotechnologies*. The Court has made a point of distinguishing between a true jurisdictional limitation and a merits determination, noting that "Courts—including this Court—have sometimes mischaracterized claim-processing rules or elements of a cause of action as jurisdictional limitations, particularly when that characterization was not central to the case, and thus did not require close analysis." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 161 (2010). The Court emphasized that "[its] recent cases evince a marked desire to curtail [] drive-by jurisdictional rulings, which too easily can miss the critical difference[s] between true jurisdictional conditions and nonjurisdictional limitations on causes of action." *Id.* (internal quotation marks and citation omitted).

As the Court framed the issue in *Morrison*, "to ask what conduct § 10(b) [of the Securities Exchange Act] reaches is to ask what conduct § 10(b) prohibits, which is a merits question. Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case." 561 U.S. at 254 (internal quotation marks omitted). The FTAIA, like § 10(b) of the Securities Exchange Act, plainly "remov[es conduct] from the Sherman Act's reach." *Empagran*, 542 U.S. at 161. To the extent *LSL Biotechnologies* signaled the contrary, intervening Supreme Court precedent clarifies that the issue of "what conduct [the FTAIA] prohibits" is a merits question, not a jurisdictional one. *See Morrison*, 561 U.S. at 254. In concluding that the FTAIA is not a jurisdictional limitation on the court's power, we bring our precedent into line with the Court's admonition "to bring some discipline to the use of" the term "jurisdictional." *See Henderson*, 131 S. Ct. at 1202 ("We have urged that a rule should not be referred to as

jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction.").

Other circuits that have considered the question post-*Morrison* are in accord.[7] Relying on *Morrison*, the Seventh Circuit held that "the FTAIA sets forth an element of an antitrust claim, not a jurisdictional limit on the power of the federal courts." *Minn-Chem*, 683 F.3d at 852. The Second and Third Circuits reached the same conclusion. *See Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014) ("[W]e have little difficulty concluding that the requirements of the FTAIA go to the merits of an antitrust claim rather than to subject matter jurisdiction."); *Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 467–68 (3d Cir. 2011) ("[T]he FTAIA constitutes a substantive merits limitation rather than a jurisdictional limitation."). The FTAIA does not limit the power of the federal courts; rather, it provides substantive elements under the Sherman Act in cases involving nonimport trade with foreign nations.

## B.  THE FTAIA CHALLENGES

The following jury instruction sums up the heart of the Sherman Act violation:

---

[7] A number of courts have referred to the FTAIA as jurisdictional, but did so prior to the Supreme Court's decisions in *Reed Elsevier* and *Morrison* and without analyzing whether the FTAIA concerns subject-matter jurisdiction or the scope of coverage of antitrust laws. *See, e.g.*, *United States v. Anderson,* 326 F.3d 1319, 1329–30 (11th Cir. 2003); *Dee-K Enters., Inc. v. Heveafil Sdn. Bhd*, 299 F.3d 281, 287 (4th Cir. 2002); *Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 429–30 (5th Cir. 2001); *Nippon Paper Indus. Co.*, 109 F.3d at 3–4; *see also Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 439 n.4 (6th Cir. 2012) ("sav[ing] the resolution of this issue for another day" post-*Morrison*).

[T]he government must prove each of the following elements beyond a reasonable doubt:

*First*, that the conspiracy existed at or about the time stated in the indictment;

*Second*, that the defendants knowingly - that is, voluntarily and intentionally - became members of the conspiracy charged in the indictment, knowing of its goal and intending to help accomplish it; and

*Third*, that the members of the conspiracy engaged in one or both of the following activities:

(A) fixing the price of TFT-LCD panels targeted by the participants to be sold in the United States or for delivery to the United States; or

(B) fixing the price of TFT-LCD panels that were incorporated into finished products such as notebook computers, desktop computer monitors, and televisions, and that this conduct had a direct, substantial, and reasonably foreseeable effect on trade or commerce in those finished products sold in the United States or for delivery to the United States. In determining whether the conspiracy had such an effect, you may consider the total amount of trade or

commerce in those finished products sold in the United States or for delivery to the United States; however, the Government's proof need not quantify or value that effect.

The defendants argue that (i) the indictment was insufficient because it did not name or cite the FTAIA, (ii) the indictment and evidence are insufficient as to both import trade and domestic effects, and (iii) the domestic effects exception, which was not alleged in the indictment, is an element of a Sherman Act offense that implicates the FTAIA and thus this instruction constructively amended the indictment.

### 1. THE FTAIA IN THE INDICTMENT

The defendants argue that the indictment was flawed for failing to mention the FTAIA by name or statutory citation. However, as explained in detail with regard to import trade and domestic effects, the indictment contained the factual allegations necessary to establish that the FTAIA either did not apply or that its requirements were satisfied.

In any event, there was absolutely no prejudice from the indictment's failure to cite the FTAIA. "Unless the defendant[s] w[ere] misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction." Fed. R. Crim. P. 7(c)(2); *see United States v. Vroman*, 975 F.2d 669, 671 (9th Cir. 1992) ("Correct citation to the relevant statute, though always desirable, is not fatal if omitted."). The parties raised the FTAIA requirements

throughout the proceedings, and the district court record is full of briefing and argument on the FTAIA.

### 2.   IMPORT TRADE AND THE FTAIA

The appropriate characterization of the import trade provision of the FTAIA is essential to our analysis.  The statute provides that the Sherman Act "shall not apply to conduct involving trade or commerce (other than import trade or import commerce)," and then goes on to provide limitations vis-a-vis nonimport commerce.  15 U.S.C. § 6a. We agree with the defendants that this section should not be labeled an FTAIA exception.  Rather, more accurately, import trade, as referenced in the parenthetical statement, does not fall within the FTAIA at all.  It falls within the Sherman Act without further clarification or pleading. Consequently, we disagree with the defendants' view that the indictment was insufficient because it did not allege import trade under the FTAIA.

The indictment charged a violation of § 1 of the Sherman Act and alleged that the defendants "entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ("TFT-LCD") in the United States and elsewhere." *See United States v. Morrison*, 536 F.2d 286, 288 (9th Cir. 1976) ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." (internal quotation marks omitted)).  Apart from tracking the language of the Sherman Act in the

indictment, the government did, in fact, plead and prove that the defendants engaged in import trade.

In *Empagran*, the Supreme Court explained the somewhat convoluted scope of the FTAIA:

> [The FTAIA] initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach.   It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a direct, substantial, and reasonably foreseeable effect on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the effect must giv[e] rise to a [Sherman Act] claim.

542 U.S. at 162 (internal quotation marks omitted).  Under its plain terms, the FTAIA does not affect import trade.  *See id.*; *Dee-K Enters.*, 299 F.3d at 287 ("Because this case involves importation of foreign-made goods, however—conduct Congress *expressly exempted* from FTAIA coverage as involving . . . import trade or import commerce . . . with foreign nations—the FTAIA standard obviously does not directly govern this case." (internal quotations marks and citation omitted)).

The  legislative  history  supports  this  statutory interpretation.  House Reports are clear that the FTAIA does not  implicate  import  trade.  "A  transaction  between  two foreign firms, even if American-owned, should not, merely

by virtue of the American ownership, come within the reach of our antitrust laws. Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions—that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on domestic commerce or a domestic competitor. . . . It is thus clear that wholly foreign transactions as well as export transactions are covered by the Amendment, but that import transactions are not." H.R. Rep. 97-686, at 9–10.

Although our circuit has not defined "import trade" for purposes of the FTAIA, not much imagination is required to say that this phrase means precisely what it says. As the Seventh Circuit held in a case involving foreign cartel members,"transactions that are directly between the [U.S.] plaintiff purchasers and the defendant cartel members *are* the import commerce of the United States . . . ." *Minn-Chem*, 683 F.3d at 855. Similarly, the Sixth Circuit labeled goods manufactured abroad and sold in the United States "import commerce." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 438 n.3, 440 (6th Cir. 2012). So too are transactions between the foreign defendant producers of TFT-LCDs and purchasers located in the United States.[8] *See id*.

---

[8] The Third Circuit also addressed the import trade exclusion, holding that it applies to importers and to defendants whose "conduct is directed at a U.S. import market," even if the defendants did not engage in importation of products into the United States. *Animal Sci. Prods.*, 654 F.3d at 471 & n.11. We need not determine the outer bounds of import trade by considering whether commerce directed at, but not consummated within, an import market is also outside the scope of the FTAIA's import provisions because at least a portion of the transactions here involves the heartland situation of the direct importation of foreign goods into the United States. *See id*.

The defendants' conduct, as alleged and proven, constitutes "import trade," and falls outside the scope of the FTAIA. The allegations in the indictment, which we review de novo, *United States v. O'Donnell*, 608 F.3d 546, 555 (9th Cir. 2010), must "ensure that [the defendants were] prosecuted only on the basis of the facts presented to the grand jury," *see United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (internal quotation marks omitted). Thus, "[a]n indictment must be specific in its charges and necessary allegations cannot be left to inference. . . . [A]n indictment should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." *O'Donnell*, 608 F.3d at 555 (citations and internal quotation marks omitted).

The indictment is replete with allegations that support the government's position that the defendants engaged in import trade. The indictment alleged that, within the conspiracy period, AUO and AUOA "engaged in the business of producing and selling TFT-LCDs to customers in the United States." During the conspiracy period, AUO employees "had one-on-one discussions in person or by phone with representatives of coconspirator TFT-LCD manufacturers during which they reached agreements on pricing of TFT-LCD sold to certain customers, including customers located in the United States." The indictment went on to allege that AUO attempted to attain the price goals set with coconspirators by, during the conspiracy period, "regularly instruct[ing] employees of [AUOA] located in the United States to contact employees of other TFT-LCD manufacturers in the United States to discuss pricing to major United States TFT-LCD customers," and that "[i]n response to these instructions, employees of [AUOA] located in the United States had regular contact through in-person meetings and

phone calls with employees of other TFT-LCD manufacturers in the United States to discuss and confirm pricing, and at times agree on pricing, to certain TFT-LCD customers in the United States."

These allegations directly describe that the defendants and their coconspirators engaged in import commerce with the United States—indeed, the conspiracy's intent, as alleged, was to "suppress and eliminate competition" by fixing the prices for panels that AUO and AUOA sold to manufacturers "in the United States and elsewhere" for incorporation into retail technology sold to consumers in the United States and elsewhere.

Going into trial, there was no surprise regarding the import trade allegations; likewise, the evidence at trial was ample on this aspect of the conspiracy. We review the defendants' sufficiency of the evidence challenge under the well established standard of *Jackson v. Virginia*, 443 U.S. 307 (1979): "viewing the evidence in the light most favorable to the prosecution," we determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319.

Trial testimony established that AUO imported over one million price-fixed panels per month into the United States. The Crystal Meeting participants earned over $600 million from the importation of TFT-LCDs into the United States. Although it was undisputed at trial that AUO and AUOA did not manufacture any consumer products for importation into the United States, the evidence revealed that AUO and AUOA executives and employees negotiated with United States companies in the United States to sell TFT-LCD panels at the prices set at the Crystal Meetings. Importation of this

critical component of various electronic devices is surely "import trade or import commerce." To suggest, as the defendants do, that AUO was not an "importer" misses the point. The panels were sold into the United States, falling squarely within the scope of the Sherman Act.

The defendants also claim that the transactions did not "target" the United States. Targeting is not a legal element for import trade under the Sherman Act, though it was included in the jury instructions at the defendants' request. In any event, the negotiations in the United States and the significant direct sales to the United States certainly qualify as targeting. The challenge to the sufficiency of the evidence fails.

In sum, the FTAIA does not apply to the defendants' import trade conduct. The government sufficiently pleaded and proved that the conspirators engaged in import commerce with the United States and that the price-fixing conspiracy violated § 1 of the Sherman Act.

### 3.  DOMESTIC EFFECTS UNDER THE FTAIA

Unlike import trade, which is exempted from the FTAIA altogether, if the government proceeds on a domestic effects theory, which it did here, the government must plead and prove the requirements for the domestic effects exception to the FTAIA, namely that the defendants' conduct had "a direct, substantial, and reasonably foreseeable effect" on United States commerce. *See* 15 U.S.C. § 6a. We hold that the indictment sufficiently alleged such conduct and reject the defendants' sufficiency of the evidence challenge to the domestic effects exception.

As with import commerce, it is important to place the domestic effects exception within the statutory framework of the FTAIA. We do not agree with the government that the FTAIA is an affirmative defense to a Sherman Act offense. The government's interpretation is at odds with the plain language of the statute, which establishes that when a case involves nonimport trade with foreign nations, the Sherman Act does not apply *unless* the FTAIA domestic effects exception applies. *See* 15 U.S.C. § 6a; *United States v. Davenport*, 519 F.3d 940, 945 (9th Cir. 2008) (contrasting elements and affirmative defenses).

The government's reliance on *McKelvey v. United States*, 260 U.S. 353, 356–57 (1922), and *United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997), which both held that the government did not have to disprove an exception to a criminal statute to obtain a conviction, is misplaced. In those cases, the statutes at issue laid out prohibited conduct and then provided an escape hatch exception. *See McKelvey*, 260 U.S. at 356 (statute prohibiting the obstruction of access to public lands "[p]rovided, this section shall not be held to affect the right or title of persons, who have gone upon, improved or occupied said lands under the land laws of the United States, claiming title thereto, in good faith" (citing Act of February 25, 1885, c. 149, 23 Stat. 321 (Comp. St. §§ 4999, 5000))); *Gravenmeir*, 121 F.3d at 528 (statute prohibiting the transfer or possession of a machine gun except "with respect to . . . (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect" (alteration in original) (citing 18 U.S.C. § 922(o))). In contrast, as a default, the FTAIA provides that when the alleged conduct involves nonimport trade with foreign nations, the Sherman Act does *not* apply. 15 U.S.C.

§ 6a; *see Empagran*, 542 U.S. at 158.  To allege a nonimport trade claim under the Sherman Act, the claim must encompass the domestic effects elements.

The indictment alleged that AUO "was engaged in the business of producing and selling TFT-LCDs to customers in the United States and elsewhere;" that, at Crystal Meetings, in telephone conversations, and in e-mail messages with other coconspirators, AUO employees reached agreements on prices for TFT-LCDs sold in the United States; and that "senior-level employees of [AUO] regularly instructed employees of [AUOA] located in the United States to contact employees of other TFT-LCD manufacturers in the United States to discuss pricing to major United States TFT-LCD customers."  The indictment also alleged that the price-fixed TFT-LCDs were used in computers and other monitors that were sold in and substantially affected interstate commerce. Specifically, the indictment charged that "the substantial terms" of the conspiracy were an agreement "to fix the prices of TFT-LCDs for use in notebook computers, desktop monitors, and televisions in the United States and elsewhere."

The magic words—"domestic effects"—were not necessary to make clear that the overseas sale of panels for incorporation into products destined for sale in the United States was a key focus of the indictment.  From the outset, the indictment targeted both import trade of panels and the effects of foreign sales on domestic commerce.  The scope of the charges was not a mystery.

The defendants argue that the FTAIA jury instruction worked a constructive amendment of the indictment because it permitted the jury to convict based on either an import trade or domestic effects theory when prior to trial the government

had only sought to rely on an import trade theory. We "have found constructive amendment of an indictment where (1) there is a complex of facts [presented at trial] distinctly different from those set forth in the charging instrument, or (2) the crime charged [in the indictment] was substantially altered at trial, so that it was impossible to know whether the grand jury would have indicted for the crime actually proved." *United States v. Adamson*, 291 F.3d 606, 615 (9th Cir. 2002) (alterations in original) (internal quotation marks omitted), *modified on other grounds by United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007).

Here, there was no constructive amendment because the facts in the indictment necessarily supported the domestic effects claim, namely by allegations that AUO and AUOA sold price-fixed panels in the United States and abroad for use in finished consumer goods sold in or delivered to the United States. The allegations gave fair notice that the claimed conduct had a "direct, substantial, and reasonably foreseeable effect" on United States commerce. *See* 15 U.S.C. § 6a(1)(A). Based on the allegations, the domestic effects instruction did not result in a constructive amendment of the indictment.

Finally, we address the sufficiency of the evidence under the domestic effects exception, which was directed at foreign sales of panels that were incorporated into finished consumer products ultimately sold in the United States. The defendants question whether the government proved the domestic effects exception at trial. As an initial matter, the parties acknowledge that the conduct was both substantial and had a reasonably foreseeable impact on United States commerce.

The defendants, however, contend that the overseas conduct was not sufficiently "direct" under the FTAIA, and that the jury was not required to find "the elements of an intent to negatively affect, and a substantial effect on, United States commerce." The essence of their objection is that the offshore conduct is too attenuated from the United States and that the intervening development, manufacture, and sale of the products worldwide resulted in a diffuse effect.

Indeed, the government's expert created some ambiguity regarding "the exact flow of how panels go from the plants of the Crystal Meeting participants into a product, to a — what are called an 'OEM' — the computer maker — and get to the United States." Admitting that there was "not good data" on how the price-fixed panels wound up in finished consumer goods sold in the United States, the expert explained that "[f]or example, Dell may have someone else put together the monitor," and that assemblers for panels were located in China, Singapore, Taiwan, Japan, and Mexico. Although negotiations took place in the United States, and there is no dispute that customers in the United States purchased finished products containing the price-fixed TFT-LCDs, such as computer monitors and laptop computers, this testimony raises a question regarding whether the effects were sufficiently direct to uphold a verdict based on the domestic effects claim.

Conduct has a "direct" effect for purposes of the domestic effects exception to the FTAIA "if it follows as an immediate consequence of the defendant[s'] activity." *LSL Biotechnologies*, 379 F.3d at 680–81 ("An effect cannot be 'direct' where it depends on such uncertain intervening

developments.").**[9]**   The statute also requires that the direct effect "gives rise to" the plaintiff's injury.  15 U.S.C. § 6a. Thus, as we have noted, "'but for' causation cannot suffice for the FTAIA domestic injury exception to apply and [we] therefore adopt a proximate causation standard."  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d at 987; *see also Empagran*, 542 U.S. at 173 ("Congress would not have intended the FTAIA's exception to bring independently caused foreign injury within the Sherman Act's reach."); *Lotes*, 753 F.3d at 414 ( "[I]n the wake of *Empagran*, three courts of appeals have considered what kind of causal connection is necessary for a domestic effect to 'give[ ] rise to' a plaintiff's claim. . . .  Agreeing with our sister circuits, we adopt that standard here." (citing *In re Dynamic Random Access Memory*, 546 F.3d at 987)).

Looking at the conspiracy as a whole, and recognizing the standard on appeal is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson*, 443 U.S. at 319, we conclude that the conduct was sufficiently "direct, substantial and reasonably foreseeable" with respect to the effect on United States commerce.  15 U.S.C. § 6a.

---

**[9]** Both the Second Circuit and the Seventh Circuit disagree with this definition of "direct."  *See Lotes*, 753 F.3d at 398 (choosing instead to [i]nterpret[]'direct' to require only a reasonably proximate causal nexus"); *Minn-Chem*, 683 F.3d at 857 ("Superimposing the idea of 'immediate consequence' on top of the full phrase results in a stricter test than the complete statute can bear.").  Whether our circuit should reconsider the stricter standard we impose is not within the province of this panel. *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) ("[A] three-judge panel may not overrule a prior decision of the court.").  But, in any event, the result is the same and the defendants benefit from our circuit's formulation.

The constellation of events that surrounded the conspiracy leads to one conclusion—the impact on the United States market was direct and followed "as an immediate consequence" of the price fixing. To begin, the TFT-LCDs are a substantial cost component of the finished products—70–80 percent in the case of monitors and 30–40 percent for notebook computers. One of the trial witnesses explained the correlation: "[I]f the panel price goes up, then it will directly impact the monitor set price." The "price stabilization" meetings, where the price fixing initially occurred, led to direct negotiations with United States companies, both domestically and overseas, on pricing decisions. As noted before, some of the panels were imported directly into the United States. Other panels were sold overseas, often to foreign subsidiaries of American companies or to systems integrators, and then incorporated into finished products. It was well understood that substantial numbers of finished products were destined for the United States and that the practical upshot of the conspiracy would be and was increased prices to customers in the United States.

There were a variety of arrangements in terms of incorporating the panels into finished products. For example, Dell had a factory in Malaysia where 100% of the products were destined for the American market. In other situations, overseas systems integrators purchased the panels for integration into finished products, often with direct oversight of TFT-LCD panel pricing by United States manufacturers. In yet other circumstances, a global product arm of a United States company purchased the panels directly from one of the co-conspirators and then sold to system integrators. It was not uncommon that the orders placed with system integrators were based on custom orders from United States customers for direct shipment to that customer. By one estimate, $23.5

billion in price-fixed panels were imported into the United States as part of finished products, such as notebook computers and computer monitors. The testimony underscored the integrated, close and direct connection between the purchase of the price-fixed panels, the United States as the destination for the products, and the ultimate inflation of prices in finished products imported to the United States. The direct connection was neither speculative nor insulated by multiple disconnected layers of transactions.

This case is unlike *LSL Biotechnologies*, where the effect of an agreement between United States and foreign firms rested on speculation as to future innovation in tomato seeds and lacked an existing effect on American tomato consumers. 379 F.3d at 681. Nor does this conspiracy fall into the category in which "action in a foreign country filters through many layers and finally causes a few ripples in the United States." *Minn-Chem*, 683 F.3d at 860.

In a closely related civil case brought by Motorola Mobility LLC against AU Optronics Corporation and other defendants, the Seventh Circuit addressed the direct effect issue vis-a-vis Motorola's claim. It noted that the arrangement "doesn't seem like 'many layers,' resulting in just 'a few ripples' in the United States cellphone market, though . . . the ripple effect probably was modest." *Motorola Mobility LLC v AU Optronics Corp.*, No. 14–8003, 2015 WL 137907, at *3 (7th Cir. Jan. 12, 2015). Ultimately the private antitrust claim failed because of the indirect-purchaser doctrine of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), but, as the court explained, "[i]f price fixing by the component manufacturers had the requisite statutory effect on cellphone prices in the United States, the Act would not block

the Department of Justice from seeking criminal or injunctive remedies." *Id.* at *10.

The jury instruction agreed to by defendants required the government to prove that the price fixing of panels that were incorporated into finished products "had a direct, substantial, and reasonably foreseeable effect on trade or commerce in those finished products sold in the United States, or for delivery to the United States." On this record, the conviction on the domestic effects prong must be upheld under *Jackson*.

Finally, we note that even disregarding the domestic effects exception, the evidence that the defendants engaged in import trade was overwhelming and demonstrated that the defendants sold hundreds of millions of dollars of price-fixed panels directly into the United States. *See* 15 U.S.C. § 6a. The evidence offered in support of the import trade theory alone was sufficient to convict the defendants of price-fixing in violation of the Sherman Act.[10]

## V. THE ALTERNATIVE FINE STATUTE

The final basis for the defendants' appeal is the $500 million fine the district court imposed on AUO pursuant to

---

[10] Reversal is not required when the jury returns a general guilty verdict and "one of the possible bases of conviction was . . . merely unsupported by sufficient evidence." *Griffin v. United States*, 502 U.S. 46, 55–56 (1991); *see Sochor v. Florida*, 504 U.S. 527, 538 (1992) (explaining that in *Griffin* the Court "held it was no violation of due process that a trial court instructed a jury on two different legal theories, one supported by the evidence, the other not. . . . [because] although a jury is unlikely to disregard a theory flawed in law, it is indeed likely to disregard an option simply unsupported by evidence"); *see also United States v. Barona*, 56 F.3d 1087, 1098 (9th Cir. 1995).

the Alternative Fine Statute, 18 U.S.C. § 3571(d). The Alternative Fine Statute provides: "If any person derives pecuniary gain from the offense, or if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than the greater of twice the gross gain or twice the gross loss . . . ." 18 U.S.C. § 3571(d). The jury found that the collective gain to the conspiracy members was over $500 million. We analyze the fine from two perspectives: (i) whether the fine was improper because it was based on the collective gains to all members of the conspiracy rather than the gains to AUO alone, and (ii) whether the district court, in not imposing joint and several liability, erred by failing to adhere to the "one recovery" rule and failing to take into account any fines paid by AUO's coconspirators. These are issues of first impression.

## A. COLLECTIVE GAINS

Whether "gross gains" under § 3571 means gross gains to the individual defendant or to the conspiracy as a whole is an issue of statutory interpretation that we review de novo. *United States v. Marbella*, 73 F.3d 1508, 1515 (9th Cir. 1996). The district court instructed the jury as follows:

> In determining the gross gain from the conspiracy, [the jury] should total the gross gains to the defendants and the other participants in the conspiracy from affected sales of (1) TFT-LCD panels that were manufactured abroad and sold in the United States or for delivery to the United States; or (2) TFT-LCD panels incorporated into finished products such as notebook computers

and desktop computer monitors that were sold in the United States or for delivery to the United States. Gross gain is the additional revenue to the conspirators from the conspiracy.

This instruction was proper because the statute unambiguously permits a "gross gains" calculation based on the gain attributable to the entire conspiracy.

The statute does not require that the gain derive from the defendant's "own individual conduct," as AUO reads it. Indeed, AUO's interpretation reads additional provisions into the statute. AUO relies on *United States v. Pfaff*, 619 F.3d 172, 175 (2d Cir. 2010) (per curiam), which held that the jury must find the gain or loss amount to impose a fine beyond the limits set by § 3571. *Id. Pfaff* is not instructive because it was not a conspiracy case; it did not address whether gross gains could include gains to all coconspirators. *Id.* at 173. Nor has AUO pointed to any case that supports its suggested interpretation, which is contrary to the plain text of the statute.[11]

AUO's offense is the conspiracy to fix prices for TFT-LCDs. The jury found $500 million in gross gains from that offense. The unambiguous language of the statute permitted the district court to impose the $500 million fine based on the gross gains to all the coconspirators.

---

[11] AUO also points to the legislative history, a comment from the Sentencing Guidelines, and the rule of lenity. Because the text of the statute is unambiguous, we stop with the text and do not refer to extrinsic sources to divine its meaning. *See O'Donnell*, 608 F.3d at 555.

**B. JOINT AND SEVERAL LIABILITY**

AUO also argues that the district court erred by failing to follow principles of joint and several liability in imposing the fine, an approach that would have required a reduction from the fine amount of the portion already paid by AUO's coconspirators. However, AUO offers no support for the proposition that § 3571(d) incorporates principles of joint and several liability. The cases it cites do not address whether the "one recovery" rule of joint and several liability applies to § 3571(d), nor do they even discuss § 3571(d). At best, two of the cited cases establish that joint and several liability is an option available to a sentencing court. *See United States v. Pruett*, 681 F.3d 232, 249 (5th Cir. 2012); *United States v. Radtke*, 415 F.3d 826, 836 (8th Cir. 2005). The other cases, which address the imposition of civil penalties in RICO prosecutions and civil asset forfeiture, are similarly inapposite because the purpose of criminal fines is to punish the offender, not to compensate a victim or disgorge ill-gotten gains. *See Schachter v. Comm'r.*, 255 F.3d 1031, 1034–35 (9th Cir. 2001). No statutory authority or precedent supports AUO's interpretation of the Alternative Fine Statute as requiring joint and several liability and imposing a "one recovery" rule.

**AFFIRMED.**